IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 1:14-CR-202 |
| | ) | Sentencing Date: September 18, 2014 |
| UDAYA KUMAR KEELAKATTU | ) | The Honorable Anthony J. Trenga |
| a/k/a "Udayakumar Radhakrishnan | ) | |
|     Keelakattu" | ) | |
| a/k/a "Uday Kumar Keelakattu" | ) | |

## POSITION OF THE UNITED STATES
## WITH RESPECT TO SENTENCING

The United States of America, through its attorneys, Dana J. Boente, United States

Attorney, and Jason M. Scheff, Special Assistant United States Attorney, files this Position of the

United States with Respect to Sentencing in this case.   Defendant Udaya Kumar Keelakattu has

pleaded guilty to a single count of visa fraud, in violation of Title 18, United States Code, Section

1546(a).   Consistent with the guideline calculations by the United States Probation Office and

with the government's obligations under the Plea Agreement, the United States respectfully asks

that this Court impose a sentence of fifteen months, which is within the properly calculated

Sentencing Guidelines range of 12-18 months, followed by a period of supervised release.   This

sentence appropriately accounts for each of the factors set forth in 18 U.S.C. § 3553(a).

## BACKGROUND

Udaya Kumar Keelakattu is a native of India and became a naturalized United States

Citizen on September 25, 2008.   Presentence Investigation Report ("PSR") ¶¶ 64, 66.   From

January 2003 until April 2012, Mr. Keelakattu was the owner and president of Ling Technologies, Inc. ("Ling").   PSR ¶¶ 20, 76.

While serving as the head of Ling, Mr. Keelakattu filed fraudulent visa paperwork on behalf of individuals whom he was purportedly going to employ at Ling.   Mr. Keelakattu filed one of these fraudulent visa documents, Form ETA-9035E, on or about May 16, 2011, with the United States Department of Labor ("DOL") and another, an I-129 petition, with United States Citizenship and Immigration Services ("USCIS") on or about June 8, 2011.   PSR ¶¶ 21-22.   Mr. Keelakattu signed both of these documents and attested that they were truthful.   *Id.*   Contrary to these attestations, Mr. Keelakattu knew that these documents were fraudulent and were being submitted with the intent to defraud the United States government.   PSR ¶¶ 23, 30.

Mr. Keelakattu falsely attested in these documents that he was hiring a particular worker, K.C. to work for Ling.   However, Mr. Keelakattu well knew that K.C. did not work for Ling and had no plans to work for Ling.   PSR ¶¶ 21-23.   K.C. was instead working for Company A—and was going to continue working for Company A—and Mr. Keelakattu was merely feigning being K.C.'s visa sponsor.   PSR ¶ 23-24.

Mr. Keelakattu then recovered a minimum of $39,000 from K.C. for doing nothing more than filing this fraudulent visa paperwork.   PSR ¶¶ 25-26.   Mr. Keelakattu has admitted that he filed fraudulent visa documents for as many as twenty-five individuals.[1]   PSR ¶ 28.   As a direct result of these fraudulent visa filings, Mr. Keelakattu made proceeds of at least $439,750.   PSR ¶ 29.

---

1 Although the visas filed for each individual in this case involved multiple fraudulent visa documents, *see, e.g.*, PSR ¶¶ 12-13, the Sentencing Guidelines instruct that "set[s] of documents intended for use by a single person" are treated as one document, U.S. SENTENCING GUIDELINES MANUAL § 2L2.1, application note 2 (2013).

Under 18 U.S.C. § 1546(a), the maximum penalties for Mr. Keelakattu's offense are ten years imprisonment, a fine of $250,000, a $100 special assessment, and three years of supervised release.

The base offense level for a violation of Section 1546(a) is eleven.   U.S. SENTENCING GUIDELINES MANUAL § 2L2.1(a) (2013).   Mr. Keelakattu also receives a three-point sentencing enhancement because he submitted between six and twenty-five fraudulent visa documents.   *Id.* § 2L2.1(b)(2)(A).   Mr. Keelakattu also receives a role enhancement for being an organizer, leader, manager, or supervisor in the criminal activity at issue.   *Id.* § 3B1.1(c).   Given Mr. Keelakattu's acceptance of responsibility and timely notification of his intention to enter a plea of guilty, a two-level reduction in offense level is appropriate.   *See id.* § 3E1.1(a).   For the same reason, the United States moves for the Court to grant an additional one-level reduction in offense level, pursuant to Section 3E1.1(b) of the United States Sentencing Guidelines.   This yields a total offense level of thirteen, and because Mr. Keelakattu is in Criminal History Category I, the guideline range is 12-18 months.

It is the position of the United States that the guideline range sufficiently accounts for Mr. Keelakattu's personal circumstances, such that there are no factors warranting a departure, or variance, from the guideline range.   The United States Probation Office agrees.   PSR ¶ 93.

## ARGUMENT

Since the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), the Fourth Circuit has provided district courts with the following guidance in sentencing:

> [A] district court shall first calculate (after making the appropriate findings of fact) the range prescribed by the guidelines.   Then, the court shall consider that range as

well as other relevant factors set forth in the guidelines and those factors set forth in [18 U.S.C.] § 3553(a) before imposing the sentence.

*United States v. Hughes*, 401 F.3d 540, 546 (4th Cir. 2005).

Section 3553 enumerates a number of factors that a court is to consider when making a sentencing determination, including, as relevant here, the following: the nature and circumstances of the offense and the history and characteristics of the defendant; the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment, and to serve as an adequate deterrent; the kinds of sentences available; the guideline range; and the need to avoid unwarranted sentencing disparities.   18 U.S.C. § 3553 (2012). Applying these factors demonstrates that a sentence of fifteen months, to be followed by a period of supervised release, is appropriate and reasonable.

I.      **A Sentence of Fifteen Months is Warranted Given the Nature and Circumstances of the Offense and the History and Characteristics of the Defendant.**

Mr. Keelakattu has admitted to filing fraudulent visa documents for between six and twenty-five individuals, a pattern of conduct from which he reaped at least $439,750 in ill-gotten gains.   The PSR explores the fraudulent documents filed by Mr. Keelakattu for seven individuals. *See* PSR ¶¶ 21-23, 33-41.   The scope of this conduct, as well as the specific details of the scheme, are accurately accounted for in the calculation of the guideline range and militate in favor of a fifteen-month sentence.

Mr. Keelakattu came to the United States in 1995 armed with a strong educational background and technological know-how.   PSR ¶¶ 66, 74.   He eventually parlayed these skills into starting Ling Technologies in 2003.   PSR ¶ 76.   But rather than use his skills to create a technological company that comported with all U.S. laws and regulations, Mr. Keelakattu used his

4

specialized knowledge to game the system and to take advantage of individuals without his level of sophistication.

This is not a case with a humanitarian aspect; that is, Udaya Kumar Keelakattu did not submit these fraudulent visa documents to help anyone except Udaya Kumar Keelakattu.   Rather, this scheme played out in two different ways, with Mr. Keelakattu having devised both iterations in order to take advantage of foreign nationals who were desperate to avoid deportation and/or uninformed about American visa protocols.

In one form of the scheme, Mr. Keelakattu preyed on individuals, like K.C., who were in need of a visa and found themselves trapped between multiple rocks and hard places.   The situation that K.C. found himself in during the summer of 2011, for example, was either lose his job opportunity at Company A, and thus his reason for being permitted to stay in the United States, or submit to Mr. Keelakattu's extortionate demands.   *See* PSR ¶¶ 21, 23-24, 26.   When face with the looming reality of having to leave the United States, either voluntarily or by being deported, K.C. turned to Mr. Keelakattu and agreed to pay all of the money that Mr. Keelakattu demanded. *See* PSR ¶¶ 24, 26.   In the end, Mr. Keelakattu, seeing the law as no impediment, saw no reason not to exploit K.C. for Mr. Keelakattu's own personal gain when all that he had to do was sign his name to some fraudulent documents in order to take home tens of thousands of dollars.

The other form of the scheme involved defrauding not just the United States government, but also the visa holders themselves.   This is the situation in which G.C. found himself.   In fall 2008, Mr. Keelakattu filed visa paperwork for G.C., attesting that he would pay G.C. $55,000. PSR ¶ 36.   Not only was Ling not paying G.C. this money, but to add insult to injury, the few paychecks that Ling did issue to G.C. came with the proviso that G.C. immediately repay the

money to Ling.   *See id.*   The money trail from Ling to G.C. was merely an optical illusion, and

for six months, G.C. was allowed to keep nothing.   *See id.*   Ultimately after working with Ling

for approximately one year, G.C. earned only about $20,000, a $35,000 shortfall from what Mr.

Keelakattu told the United States government that Ling would pay G.C.   *Id.*

Finally, recognizing the situation in which he was putting these individuals, Mr. Keelakattu

would seek vengeance when the individuals for whom he had sponsored a visa would try to get out

from under his thumb.   When F.J. finally found another job—and was finally able to leave Ling

without risking deportation—Mr. Keelakattu told her that he would ensure that she would never

work for the other company, and he also refused to pay her the last month and a half of her wages.

PSR ¶ 37.

Mr. Keelakattu used his know-how to exploit unsophisticated foreign workers and to take

advantage of their desperate attempts to work in the United States.   He did so for his own financial

gain and without any regard for the law.

## II.   A Fifteen-Month Sentence is Sufficiently Severe, but not Greater than Necessary, to Reflect the Seriousness of the Offense, Promote Respect for the Law, Provide Just Punishment, and Serve as an Adequate Deterrent.

The H-1B visa program is designed to allow employers to recruit foreign workers when

they are not able to find similarly qualified American workers.   *See* United States Department of

Labor, Wage and Hour Division, *H-1B Program*, (last visited Sept. 7, 2014),

http://www.dol.gov/whd/immigration/h1b.htm.   The laws surrounding the program are structured

the way that they are "in order to protect similarly employed U.S. workers from being adversely

affected by the employment of the nonimmigrant workers, as well as to protect the H-1B

nonimmigrant workers" themselves.   *Id.*   For example, H-1B visa workers must be paid at least

the "prevailing wage" in order for the employment of the foreign worker to "not adversely affect

the wages and working conditions of comparably employed U.S. workers."   PSR ¶ 12 n.1.

The H-1B visa program is an extremely competitive program, with annual visas capped at

65,000, 8 U.S.C. § 1184(g)(1)(A)(vii), with an additional 20,000 visas permitted for individuals

with more advanced education, *id.* at § 1184(g)(5)(C).   The 2014 quota filled up within the first

week of the filing period, and approximately 124,000 H-1B petitions were received.   *USCIS*

*Reaches FY 2014 H-1B Cap*, Apr. 8, 2013, http://www.uscis.gov/news/uscis-reaches-fy-2014

-h-1b- cap.   It is axiomatic that any H-1B visa obtained under false pretenses is one less visa that

is available to an honest worker, as well as potentially one less job that could have been filled by an

American worker.

The H-1B program has been criticized, however, as being rife with fraud.   USCIS

published a study in 2008 in which it had analyzed 246 petitions filed between October 1, 2005,

and March 31, 2006, finding a fraud rate of over thirteen percent.   *See, e.g.*, H-1B Visas:

Designing a Program to Meet the Needs of the U.S. Economy and U.S. Workers: Hearing Before

the House Committee on the Judiciary Subcommittee on Immigration Policy and Enforcement

Testimony, 4 (2011) (written testimony of Donald Neufeld, Associate Director, Service Center

Operations Directorate, U.S. Citizenship and Immigration Services).   Continued abuse of the

H-1B visa program heightens the need to impose a sentence in this case, and others, that is

sufficiently harsh that it will serve to deter all those who seek to abuse the H-1B visa process, as

well as other government programs.   Lengthy sentences of imprisonment demonstrate a lack of

tolerance for the exploitation of such programs, especially when it is done so for personal gain.   A

fifteen-month sentence not only has this desired deterrent effect, but it is also sufficiently punitive. It is important that any sentence serve as adequate punishment for Mr. Keelakattu, given the fraud that he perpetrated and the individuals whom he victimized.   A fifteen-month sentence, followed by a term of supervised release, serves that retributive purpose.

<b><u>CONCLUSION</u></b>

Therefore, for the above-stated reasons, the United States respectfully requests a sentence of fifteen months, to be followed by a term of supervised release.

Respectfully submitted,

Dana J. Boente
United States Attorney

Date: September 11, 2014          By:   _____/s/_____
Jason M. Scheff
Special Assistant United States Attorney
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, VA 22314
Phone: (703) 299-3700
Fax: (703) 299-3980
E-mail: jason.scheff@usdoj.gov

Allison Ickovic
Special Assistant United States Attorney (LT)

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on or about September 11, 2014, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following counsel for the defendant:

Justin Emerson Dillon, Esq.
1400 Eye St NW, Suite 525
Washington, D.C. 20005
(202) 640-2850
Email: jdillon@tklf.com

Jay L. Strongwater, Esq.
Two Midtown Plaza, Suite 1250
1349 West Peachtree Street
Atlanta, GA 30309
(404) 872-1700
jls@strongh2o.com

By: _____ /s/ _____

Jason M. Scheff
Special Assistant United States Attorney
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, VA 22314
Phone: (703) 299-3814
Fax: (703) 299-3980
E-mail: jason.scheff@usdoj.gov

9